JAGDISH C. LAUL,

     **Plaintiff,**

vs.                      **No. 16 CV 1017 JAP/KBM**

LOS ALAMOS NATIONAL
LABORATORIES,

     **Defendant.**

### MEMORANDUM OPINION AND ORDER

In DEFENDANT LOS ALAMOS NATIONAL SECURITY, LLC'S MOTION AND

MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Doc. No. 58)

(Motion), Los Alamos National Security (LANS)[1] asks the Court to dismiss all of Plaintiff's

claims for alleged violations of the New Mexico Human Rights Act (NMSA 1978 § 28-1-1 *et*

*seq.*) (NMHRA), the Age Discrimination in Employment Act (29 U.S.C. § 621 *et seq.*) (ADEA),

and Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2(a)(1) (Title VII). *See*

COMPLAINT FOR EMPLOYMENT DISCRIMINATION AND RETALIATION (Doc. No. 1)

(Complaint). The Motion is fully briefed.[2] In the Complaint, Plaintiff, who was discharged from

employment at LANS in December 2013, alleges that LANS discriminated against and retaliated

against him in refusing to rehire him for other positions at LANS. (Compl. ¶ 15.) Because

---

[1] Although originally named Los Alamos National Laboratories, the Defendant's name has been changed to Los Alamos National Security, LLC and the Court will refer to Defendant by that name or as LANS.
[2] *See* PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 64) (Response); *and* DEFENDANT LOS ALAMOS NATIONAL SECURITY LLC'S REPLY BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT (Doc. No. 69) (Reply).

Plaintiff failed to present evidence that LANS discriminated against or retaliated against him, the Court will grant the Motion.

I.      STANDARD OF REVIEW

Summary judgment may be granted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When applying this standard, the Court examines the factual record and reasonable inferences therefrom in the light most favorable to the party opposing summary judgment. *Applied Genetics Intl, Inc. v. First Affiliated Sec., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). The party seeking summary judgment bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted). Once the movant meets this burden, the non-moving party must designate specific facts showing that there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). In considering a motion for summary judgment, the Court's role is simply to determine whether the evidence proffered by plaintiff would be sufficient, if believed by the ultimate factfinder, to sustain the claim. *Foster v. Alliedsignal, Inc.*, 293 F.3d 1187, 1195 (10th Cir. 2002).

At the summary judgment stage and at trial, federal courts follow the *McDonnell Douglas Corp. v. Green*,[3] burden-shifting approach in assessing discrimination and retaliation claims under the ADEA, the NMHRA, and Title VII.

II.     BACKGROUND

Plaintiff is a 78 year old naturalized United States citizen of East Indian birth. (Compl. ¶ 6.) In 1999, when Plaintiff was 60 years old, LANS hired him as a Safety Basis Analyst (SBA-

---

[3] 411 U.S. 792, 802–803 (1973).

3).[4] (*Id.* ¶ 5.) At first, Plaintiff received awards, honors, and "kudos" for his work; however, LANS terminated Plaintiff's employment on December 6, 2013 after Plaintiff received several negative evaluations and after Plaintiff unsuccessfully participated in a year-long Performance Improvement Plan (PIP).[5] The negative evaluations and disciplinary actions focused on Plaintiff's unprofessional, disrespectful, and disruptive behavior and his inability to perform assigned tasks. *Laul v. Los Alamos Nat'l Laboratories*, 15 CV 749 JAP/KBM, 2016 WL 9777256, at *5 (D.N.M. Sept. 27, 2016), *aff'd,* 714 F. App'x 832, 2017 WL 4772415 (10th Cir. Oct. 23, 2017) *pet. for cert. filed* (*Laul I*). The PIP focused on "significant deficiencies in [Plaintiff's] work performance[,]" including Plaintiff's "tendency to rely on others too much to help him complete his work[,]" and Plaintiff's failure to exhibit "the amount of understanding of safety basis issues[.]"*Id.* at *6–*7 (quoting 2012 performance evaluation). LANS keeps employment termination letters in an employee's file indefinitely.[6]

On January 2, 2014, Richard Marquez, LANS' Executive Director, informed Plaintiff in an email that despite having been discharged, he could apply for external positions at LANS for

---

[4] LANS had four Safety Basis Analyst levels. Safety Basis Analyst (SBA) 1 was the lowest and SBA 4 was the highest level.

[5] The facts related to the pre-termination events are set forth in the MEMORANDUM OPINION AND ORDER (Doc. No. 83) granting LANS' motion for summary judgment in *Laul I*. In that case, Plaintiff brought claims that he was discharged based on his age, national origin, and in retaliation for complaining about discrimination. 2016 WL 9777256, at *16.

[6] Plaintiff testified in his affidavit that letters of termination were kept in an employee's file for one year (Laul Aff. ¶ 17); however, Ms. Barbara Pacheco, the Human Resources Generalist for the Associate Directorate for Nuclear and High Hazard Operations testified:

> Q. And if an employee like Dr. Laul has been terminated for performance issues, how long does that stay in his file, as far as the record of the termination?
> A. The termination folder stays whole forever.
> Q. And can hiring managers, can they look at those folders and find out if an employee's been terminated?
> A. They can.

(Resp. Ex. D, Pacheco Dep. 42:21–43:5.) Without evidentiary support, Plaintiff alleges that LANS intentionally failed to remove Plaintiff's December 6, 2013 termination letter from his personnel file after the one-year period in order to prevent Plaintiff from being rehired. (Laul Aff. ¶ 18.) The Court will disregard this evidence as not based on personal knowledge. Fed. R. Civ. P. 56(c)(4).

which he was qualified.[7] (*Id.* ¶ 10.) From October 20, 2014 to May 4, 2015, Plaintiff applied for

19 positions[8] at LANS but was not interviewed for any of the positions. (*Id.* ¶¶ 13–14.) Plaintiff

alleges that he was "well-qualified" for all of the positions due to his "strong educational

background, excellent credentials, relevant professional certifications, and approximately 38

years of experience in various scientific disciplines." (*Id.* ¶ 15.)

      A.     LANS issues a "Be on the Lookout" (BOLO)

In early 2014, Plaintiff went to LANS' Occupational Medicine (Occ. Med.) building and

asked to speak to Janet McMillan, a Certified Occupational Health Nurse at LANS and the wife

of LANS' Director, Charles McMillan. (Mot. Ex. 16, J. McMillan Dep. 4:5–5:20; 9:14–10:17;

Mot. Ex. 17, J. McMillan Decl. ¶¶ 2, 4.) Plaintiff found Ms. McMillan in a small triage office

near the main lobby and handed her a picture of himself, Ms. McMillan and Mr. McMillan that

was taken at a holiday event one year earlier. (J. McMillan Decl. ¶ 4, J. McMillan Dep. 9:20–

10:4.) Plaintiff asked to speak with Ms. McMillan and closed the office door. (J. McMillan Dep.

10:5–8.) Plaintiff told Ms. McMillan that he had been unfairly discharged, and Plaintiff asked

Ms. McMillan to take some documents to Mr. McMillan and to tell her husband to reinstate his

employment. (*Id.* 10:13–17.) Ms. McMillan refused to take the documents and told Plaintiff to

talk to the appropriate people at LANS. Plaintiff continued to urge Ms. McMillan to take the

documents to her husband. (*Id.*) After Ms. McMillan's refusals, Plaintiff raised his voice and

physically approached Ms. McMillan in her "personal space." (*Id.* 11:10–19.) Ms. McMillan

testified that Plaintiff told her that if she did not take the documents, he would contact the press,

---

[7] Plaintiff alleges that LANS intentionally refused to place the January 2, 2014 email into Plaintiff's personnel file, which prevented him from being rehired. (*Id.*) Since no other evidence supports this assertion, the Court will not consider it. Moreover, the email merely stated the obvious, that Plaintiff could apply for external positions as a former employee.
[8] Plaintiff applied for 30 positions; however, LANS cancelled 11 of them. Thus, only 19 positions are at issue in this lawsuit. (Mot. at 4, UMF 2, Ex. 2 Laul Dep. 402:3–17.)

and he would "make things very ugly for me, my husband, and the laboratory [LANS]." (*Id.* 11:20–23.) Ms. McMillan felt threatened by Plaintiff's words and actions, maneuvered toward the closed door, and opened the door while saying "I have clients coming and I need to go now." (*Id.* 12:1–8.) Plaintiff followed Ms. McMillan out to the front desk while repeating the statement that he would contact the press and make things ugly for the McMillans and LANS. (*Id.* 12:15–15.) Plaintiff then left the building. (*Id.* 12:17–20.) Ms. McMillan reported this incident to her supervisor, Laura Kosky, but told Ms. Kosky not to file an official report because Ms. McMillan thought she had given information to Plaintiff that would help him. (*Id.* 12:21–25; J. McMillan Decl. ¶ 10.)

On June 30, 2015, Plaintiff again visited the Occ. Med. building. (*Id.* ¶ 11.) Ms. McMillan was working in her private office, and Plaintiff asked the front desk receptionist to page her. (J. McMillan Dep. 14:10–16.) Ms. McMillan testified she responded to the page, but "… when I came around the corner and I saw him, I instantly recognized him[.]" (*Id.* 14:19.) Plaintiff asked Ms. McMillan if they could go to a "private place to talk, like my office." (*Id.* 15:1–5.) Ms. McMillan responded

> No, I don't think anything that we would be talking about would be a problem. Sit right down here.… He resumed his same presentation as before. He said he had not gotten his job back … and this made me nervous, because if he didn't get that job back, I didn't know how he would be able to be in the building, because it's a secure building and you have to badge in.... And then he had an envelope, which he said were papers I need to present to my husband to help him get his job back.

(*Id.* 15:6–16:4.) Ms. McMillan again refused to take the documents, and Plaintiff threatened to "make it very ugly for you." (*Id.* 16:8–9.) Ms. Losky walked into the lobby, and Ms. McMillan called her over. (*Id.* 16:16.) One of the health care providers, Wally Collings also entered the lobby. Mr. Collins testified that Plaintiff continued to urge Ms. McMillan to take the paperwork to her husband or Plaintiff would "go to the press." (Mot. Ex. 18, Collins Decl. ¶ 4.) Mr. Collins

intervened, asked Ms. McMillan to go to her office, and escorted Plaintiff out of the building. (Mot. Ex. 18, Collins Decl. ¶ 6.) Ms. McMillan sent an email describing this second incident to Richard Marquez, Executive Director of LANS, and sent a copy of the email to her husband. (Mot. Ex. 16, J. McMillan Decl. ¶ 16; J. McMillan 25:25–26:6.)

After receiving the email, Mr. Marquez informed Michael Lansing, Acting Principal Associate Director for Operations and Business, about the incident. (Mot. Ex. 19, Marquez Dep. 22:20–23:8.) On July 1, 2015, Mr. Lansing and the LANS Personnel Security office issued a "Be on the Lookout" or BOLO for Plaintiff. (*Id.* 23:11–16.) LANS' security personnel use a BOLO to alert officials at LANS' gates that an individual is not permitted to enter LANS' property, and if the person is seen on the property, a report should be made to LANS' security office. (*Id.* 23:20–25.)

B.      Plaintiff's job applications and LANS' responses

1.      Environmental Positions

a.      Environmental Professional 3 position (IRC 35849)

On October 8, 2014, LANS posted this position, and Plaintiff submitted an application for the position on October 20, 2014. (Mot. Ex. 4, Payne Decl. ¶ 3(a).) Patricia Gallagher, now deceased, was the Environmental Stewardship Group Leader and the hiring manager for the position. (*Id.* ¶ 3.) Ms. Jennifer Payne, the current Environmental Stewardship Group Leader, was a member of Ms. Gallagher's hiring team. (*Id.* ¶¶ 2, 3(b).) Ms. Payne testified that, based on her personal knowledge as a member of the hiring team and based on a review of the relevant documents, she determined that Ms. Gallagher elected not to interview Plaintiff because Plaintiff did not meet the minimum qualifications for the position. (*Id.* ¶ 3(c).) Ms. Payne testified that Plaintiff lacked experience in maintaining compliance with the National Environmental Policy

Act (NEPA), which was required for the position. (*Id.* ¶¶ 3(c), (d), (k).) The successful candidate, Elizabeth English, a 55 year old Caucasian, had extensive experience developing and preparing NEPA compliance documents for the Chemistry and Metallurgy Replacement Project at LANS. (*Id.* ¶ 3(e).)

Ms. Payne testified that there is no indication in Ms. Gallagher's records that Ms. Gallagher was aware of Plaintiff's discharge from LANS or that Ms. Gallagher was aware of Plaintiff's complaints against LANS for discrimination. (*Id.* ¶¶ 3(g), (h).) Ms. Payne testified that there is no indication that Ms. Gallagher considered Plaintiff's age, race, or national origin in making her decision. (*Id.* 3(i).) Nor was there any indication that Ms. Gallagher was told not to interview or hire Plaintiff. (*Id.* ¶ 3(f).)

b. Environmental Professional 3 position (IRC 35763)

On October 9, 2014, LANS posted this position, and Plaintiff submitted an application for the position on October 21, 2014. (Mot. Ex. 4, Payne Decl. ¶ 3(l).) Again, the hiring manager was Ms. Gallagher, and Ms. Payne assisted her and reviewed the documents related to Ms. Gallagher's decision. (*Id.* ¶¶ 2, 3.) Ms. Payne testified that Ms. Gallagher elected not to interview Plaintiff because she determined that Plaintiff was not qualified for the position. (*Id.* ¶ 3(m).) Ms. Gallagher noted Plaintiff's lack of experience with broad environmental regulatory compliance oversight particularly under the Resource Conservation and Recovery Act (RCRA), a specific requirement for the position. (*Id.* 3(n), (t).)

The successful candidates—James Stanton, Pattie Baucom, and Victoria Baca—had between 10 and 25 years of experience with environmental regulatory compliance and RCRA. (*Id.* 3(o).) Mr. Stanton, Ms. Baucom, and Ms. Baca are younger than Plaintiff and are not East Indian. (Resp. Ex. A, Laul Aff. ¶ 7.)

7

Ms. Payne testified that there was no indication that in making this decision, Ms. Gallagher was aware of Plaintiff's previous performance issues at LANS, his discharge, or his discrimination claims against LANS. (Mot. Ex. 4, Payne Decl. ¶¶ 3(q), (r).)

        c.      Environmental Professional 3 position (IRC 37521)

On February 3, 2015, LANS posted this position, and Plaintiff submitted an application on February 12, 2015. (Mot. Ex. 4, Payne Decl. ¶ 3(u).) Patricia Gallagher was the hiring manager for the position. (*Id.* ¶ 3.) Forty-three people applied for the position. (*Id.* ¶ 3(u).) Ms. Payne, a member of the hiring team, testified that Plaintiff was not interviewed for this position because without NEPA experience, Plaintiff was not the best qualified applicant for the position. (*Id.* ¶ 3(w).) Randall Reddick was hired for this position because he had more than 20 years of experience in NEPA compliance. (*Id.* ¶ 3(x).) Mr. Reddick is younger than Plaintiff and is not East Indian. (Resp. Ex. A, Laul Aff. ¶ 19.)

Ms. Payne testified that there was no indication that Ms. Gallagher was aware of Plaintiff's previous performance issues at LANS, Plaintiff's discharge, or Plaintiff's discrimination claims against LANS. (Mot. Ex. 4, Payne Decl. ¶¶ 3(y), (z).) There was no indication that Ms. Gallagher considered Plaintiff's age, race, or national origin in her decision not to interview Plaintiff for this position. (*Id.* ¶ 3(bb).) Nor was Ms. Gallagher advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 3(y).)

        d.      Environmental Manager 3 position (IRC 37809)

On March 3, 2015, LANS posted this position, and Plaintiff submitted an application on March 5, 2015. (Mot. Ex. 11, Grieggs Decl. ¶ 3.) Anthony Grieggs, Environmental Manager 4 (Group Leader) in the Environmental Protection & Compliance Division, was the hiring manager for this position. (*Id.* ¶ 2.) Mr. Grieggs received 31 applications for this position. (*Id.* ¶ 3.)

Plaintiff, along with several of the other applicants, was not considered for the position because he "did not have the experience in environmental management and compliance that was required for the job posting." (*Id.* ¶ 5.) Michael Saladen and Mark Haagenstad were hired based on their "extensive requisite experience in environmental management and compliance." (*Id.* ¶ 6.) At the time of the hiring decision, Mr. Grieggs did not know about Plaintiff's previous performance issues, discharge, or discrimination complaints against LANS. (*Id.* ¶¶ 8, 9).) Mr. Grieggs did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 10.) Nor was he advised by James Tingey or any other LANS employee not to interview or hire Plaintiff due to his prior performance issues. (*Id.* ¶ 7.)

Ms. Saladen and Mr. Haagenstad are both substantially younger than Plaintiff and are not East Indian. (Resp. Ex. A, Laul Aff. ¶ 35.)

      e.   Plaintiff's Response

Plaintiff argues that Ms. Payne's affidavit should be disregarded because she has no personal knowledge of Ms. Gallagher's reasons for rejecting Plaintiff. (Resp. at 1–2.) The Court finds that Ms. Payne's affidavit is based on personal knowledge because she was a member of the hiring team for each of the positions.

In his deposition, however, Plaintiff testified he did not know whether Ms. Gallagher discriminated against him:

> Q. Now tell me, do you believe that … you didn't get the job because Ms.
> Gallagher was considering your age or your race or your national origin?
> A. I can't read her mind, but she knows who I am.
> Q. You called who?
> A. Gallagher knows who I am.
> Q. Yeah.
> A. And I had reviewed their program, so they know it. And whether she is
> thinking of ruling me out on national origin, race, that is her consideration. I have
> no way of knowing. I can't read her mind.

(Mot. Ex. 2, Laul Dep. 158:18–159:6.) Plaintiff asserts that he not only met the minimum

requirements for all four of the Environmental positions, but was more qualified for the positions

than the candidates who were chosen. (Resp. Ex. A, Laul Aff. ¶¶ 3, 4, 6, 7, 18, 19, 33, 34.)

Plaintiff maintains that he is "considered a Subject Matter Expert (SME) in Environmental

Regulatory Compliance Programs including NEPA." (*Id.* ¶ 3.) Plaintiff contends that his

education and experience is far superior to each of the candidates chosen for these positions.[9]

2.      Research and Development Manager 4 position (IRC 35837)

This position was located in the Actinide Analytical Chemistry Group, and was posted on

September 23, 2014. (Mot. Ex. 5, Stark Decl. ¶ 3.) Plaintiff submitted an application for this

position on October 29, 2014. (*Id.*) David Morris, the hiring manager, assigned Peter Stark, a

Research and Development Manager 4 (Group Leader) for the Chemistry Division's Chemical

Diagnostic and Engineering Group, to review and screen applications. (*Id.* ¶¶ 2–3.) Mr. Stark

reviewed Plaintiff's application and concluded that Plaintiff was not the most qualified candidate

for the position because Plaintiff's research skills in analytical and radiochemistry, an important

job qualification, were inferior to the skills of Anne Schake, the successful candidate. (*Id.* ¶¶ 4–

6.)

Mr. Stark testified that at the time he made the hiring decision, he was not aware of

Plaintiff's discharge, performance issues, or discrimination claims against LANS. (*Id.* ¶¶ 8–9.)

Mr. Stark testified that in making his decision he did not consider Plaintiff's age, race, or

---

[9] Plaintiff testified that he has "M.S. degree in Chemistry and Ph.D in Nuclear Chemistry from Purdue University, and also M.S. in Environmental Science and Engineering from CSM, CO [Colorado School of Mines]. I was involved in developing of Environmental Regulations courses of [sic] CAA (Clean Air Act), CWA (Clean Water Act), RCRA (HW), and NEPA at Rocky Flatts [sic]. I provided guidance to 10-15 workers and reviewed their Environmental reports and gave feedback for improvement. I audited LANL Environmental Regulatory Programs including Mr. Saladen [sic] CWA program in 2014…. I have published 100 reports and papers alone and in collaboration with others in various technical areas. I have received 20 Awards/Honors/Kudos from various technical projects. I am also a member of ANS, REM, CHMM, NFPA, EFCOG/SAWG under five Professional Societies/National Committees and is [sic] a Subject Matter Expert in Environmental Regulatory Compliance Programs." (Resp. Ex. A, Laul Aff. ¶ 34.)

national origin. (*Id.* ¶ 10.) Nor was Mr. Stark advised by James Tingey or any other LANS' employees that he should not interview Plaintiff due to his age, race, national origin, past performance issues, or discharge. (*Id.* ¶ 7.)

Plaintiff has acknowledged that Ms. Schake was "well qualified" for the position. (Mot. Ex. 2, Laul Dep. 194:5–11.) However, Plaintiff contends that he was more qualified than Ms. Schake: "My cover letter and resume illustrate my strong technical background with 15 years of experience in developing various radiochemical separations. I have written thirty papers on radiochemistry methodologies that deal with instrumentations and radiochemical separations. I have written two review articles involving NAA and radiochemical separations." (Resp. Ex. A, Laul Aff. ¶ 8.) Plaintiff continued: "Ms. Schake has a Ph.D in Inorganic Chemistry and a BA in Chemistry, and 20 years of experience in a nuclear facility. She has listed 42 reports and publications alone and in collaboration. Ms. Schake has won six awards and honors. She was a member of professional organizations and committees." (*Id.* ¶ 9.) Nevertheless, Plaintiff maintains that his educational background is superior. (*Id.*)

At his deposition Plaintiff testified:

Q. She was chosen. That's what it says. Justification for hire. "How is the selected candidate the most qualified?" That's what it says; right?
A. Let me read.
Well, I think she seems well qualified because the way I see it, I think she is, but if you look at my resume, my resume is also pretty good.

(Mot. Ex. 2, Laul Dep. 194:5–11.) Despite this testimony, Plaintiff opines that he was not hired because he was East Indian or because of his age.

3.    Engineer 3/4 position (IRC 36084)

On October 17, 2014, LANS posted a notice for three engineer positions, and Plaintiff submitted an application on October 31, 2014. (Mot. Ex. 6, Burnett Decl. ¶ 3.) Mel Burnett was

the hiring manager and reviewed Plaintiff's application along with 10 other applications. (*Id.* ¶¶ 3–5.) Mr. Burnett did not interview Plaintiff because Plaintiff did not have a sufficient level of experience specific to system engineering. (*Id.* ¶¶ 5, 11.) Jeffrey Freeburg, Randall Stringfield, and Jason Apperson were hired for the positions based on their extensive experience with system engineering. (*Id.* ¶ 6.)

Mr. Burnett testified that he was not aware of Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 8–9.) Mr. Burnett testified that he did not consider Plaintiff's age, race, or national origin when making the hiring decision. (*Id.* ¶ 10.) Mr. Burnett testified he was never advised by James Tingey or any other LANS employee not to interview Plaintiff for the position. (*Id.* ¶ 7.)

Plaintiff claims he was more qualified than those who were hired. (Resp. Ex. A, Laul Aff. ¶¶ 11–12.) However, Plaintiff admitted in his deposition that all three of these candidates were qualified for the position. (Mot. Ex. 2, Laul Dep. 211:1–212:17.) Plaintiff emphasizes that all three successful candidates were Caucasians and significantly younger than Plaintiff. (Resp. Ex. A, Laul Aff. ¶¶ 11–12.)

4.      Scientist 2/3 position (IRC 37277)

On January 15, 2015, LANS posted this position, and Plaintiff submitted an application for the position on January 23, 2015. (Mot. Ex. 7, Steiner Decl. ¶ 3.) Robert Steiner, the Team Leader of the Radiochemistry Group in the Chemistry Division of LANS, was the hiring manager. (*Id.* ¶¶ 2–3.) Mr. Steiner reviewed Plaintiff's application materials and elected not to interview Plaintiff because Plaintiff did not have the requisite experience in secondary ion mass spectrometry (SIMS). (*Id.* ¶¶ 4–5, 11.) Travis Tenner was hired for the position because he had extensive experience in SIMS and in using magnetic sector SIMS instruments. (*Id.* ¶ 6.)

Mr. Steiner testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 8–9.) Mr. Steiner testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 10.) Nor was Mr. Steiner advised by James Tingey or any other LANS employee not to interview Plaintiff. (*Id.* ¶ 7.)

Plaintiff again argues that he was more qualified than the successful candidate, a younger Caucasian. (Resp. Ex. A, Laul Aff. ¶¶ 14–15.) However, in his deposition, Plaintiff testified:

> Q. Do you have any reason to believe that Mr. Steiner was motivated not to interview or hire you by your age, race, age or your national origin?
> A. He has that information. Whether he was motivated or not, that is his conscience. He never called me, said JC, I am not interviewing you because blah, blah, blah. All I'm saying is he has that information through my personnel file. This is common sense.

(Mot. Ex. 2, Laul Dep. 429:25–430:8.)

5.    Quality Assurance Positions

a.    Quality Assurance Engineer 4 position (IRC 37014)

On December 15, 2014, LANS posted this position, and Plaintiff submitted an application on February 12, 2015. (Mot. Ex. 8, Sivils Decl. ¶ 3(a).) Dale Sivils, Director for the Manufacturing Quality Division of the Plutonium Science and Manufacturing Directorate, was the hiring manager. (*Id.*) Mr. Sivils reviewed Plaintiff's application materials and elected not to interview Plaintiff. According to Mr. Sivils, Plaintiff lacked the requisite experience in weapons quality work, which is very different from the safety basis work that Plaintiff had previously performed at LANS. (*Id.* ¶ 3(c).) Linda Cassidy and Joseph Pestovich were hired for this job posting based on their relevant experience. (*Id.* ¶ 3(d).)

Mr. Sivils testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.*

¶¶ 3(e), (f).) Mr. Sivils testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(g).) Nor was Mr. Sivils advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 3(e).)

Plaintiff maintains that he was more qualified than Ms. Cassidy and Mr. Pestovich who are younger Caucasians:

> Q. Do you have any reason to believe that Mr. [Sivils] hiring manager for 37014 was motivated by your race, your age, or your national origin?
> …
> A. It's possible. Many people see he is brown, he is black, he is Indian. Intrinsic bias comes in.

(Mot. Ex. 2, Laul Dep. 457:15–458:8.)

### b.     Quality Assurance Engineer 3/4 position (IRC 38532)

On April 16, 2015, LANS posted this position, and Plaintiff submitted an application on April 28, 2015. (Mot. Ex. 8, Sivils Decl. ¶ 3(j).) Mr. Sivils was also the hiring manager for this position. (*Id.*) Mr. Sivils reviewed Plaintiff's application materials and elected not to interview Plaintiff because he did not have the requisite experience in a manufacturing quality environment. (*Id.* ¶ 3(l).) Marvin Montoya, Samuel Adams, Eric Keim, David Bell, Ronald Salazar, Victoria Teel, Georgia Chavez, Daniel Stewart, and Mark Haines were hired for job posting IRC 38532 based on their extensive experience in manufacturing quality." (*Id.* ¶ 3(m).)

Mr. Sivils testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 3(o), (p).) Mr. Sivils testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(q).) Nor was Mr. Sivils advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 3(n).)

   c.  Quality Assurance Engineer 4 position (IRC 37672)

On February 13, 2015, LANS posted this position, and Plaintiff submitted an application on February 16, 2015. (Mot. Ex. 9, Tepley Decl. ¶ 3(a). Daniel Tepley, the Group Leader for the Quality and Performance Assurance Institutional Quality Group in the Quality and Performance Assurance Division, was the hiring manager. (*Id.* ¶ 3(a).) Plaintiff was not interviewed for this position because Plaintiff did not demonstrate the requisite experience in construction quality assurance. (*Id.* ¶ 3(c).) Robert Swatek was hired based on his 30 years of experience in construction quality assurance. (*Id.* ¶ 3(d).)

At the time of the hiring decision, Mr. Tepley did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 3 (f), (g).) Mr. Tepley did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(h).) Nor was Mr. Tepley advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 3(e).)

Plaintiff argues he is better qualified than Mr. Swatek, a 60-year-old Caucasian male. (Resp. Ex. A, Laul Aff. ¶¶ 20–22.) Plaintiff testified that Mr. Swatek "has some understanding of nuclear construction codes, standards, principles, and processes associated with NQA-1 program LANL SD330, and product quality. Mr. Swatek does not list any publications … and no mention of Awards/Honors/Kudos in his job service…. [nor] any memberships with Professional Societies/National Committees." (*Id.* ¶ 21.)

   d.  Quality Assurance Engineer 4 position (IRC 37732)

On February 13, 2015, LANS posted this position, and Plaintiff submitted an application on February 16, 2015. (Mot. Ex. 9, Tepley Decl. ¶ 3(j).) Mr. Tepley, the hiring manager, testified that Plaintiff was not interviewed for this position because he did not demonstrate any specific

experience in construction quality assurance. (*Id.* ¶ 3(l).) Richard Love was hired based on his history of "building teams, delivering technical training, setting goals, and developing individual employees in a construction quality assurance setting. He also had superior technical understanding of LANS' nuclear construction codes, standards, principles and processes associated with the Nuclear Quality Assurance-1 program and product quality." (*Id.* ¶ 3(m).)

Mr. Tepley testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 3 (o), (p).) Mr. Tepley testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(q).) Nor was Mr. Tepley advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 3(n).)

Plaintiff asserts he is more qualified than the successful candidate Mr. Love, who is a 71 year old Caucasian male. (Resp. Ex. A, Laul Aff. ¶¶ 23–25.) Plaintiff maintains that although Mr. Love "does have some experience in management and leadership experience, technical training delivery, goal setting, and individual employee development[,] … Mr. Love's resume does not clearly show his educational history or list any publications or reports and papers. Mr. Love does not have any Awards/Honors/Kudos in his job service, or any memberships with Professional Societies/National Committees." (*Id.* ¶ 24.)

> e.    Quality Assurance Engineer 3/4 position (IRC 37952)

On February 27, 2015, LANS posted this position, and Plaintiff submitted an application on February 28, 2015. (Mot. Ex. 9, Tepley Decl. ¶ 3(cc).) Mr. Tepley, the hiring manager, received 17 applications. (*Id.*) Plaintiff, along with several of the other applicants, was not considered for this position because he "did not demonstrate in his application any specific experience in construction quality assurance[.]" (*Id.* ¶ 3(ee).) Roger Crawford was hired based on

his "demonstrated … ability to successfully ensure quality assurance requirements were met during the design, bid, build, and start-up of various types of facilities, all of which were specifically listed in the job position as minimum requirements or desired skills." (*Id.* ¶ 3(ff).)

Mr. Tepley testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 3 (hh), (ii).) Mr. Tepley testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(jj).) Nor was Mr. Tepley advised by James Tingey or any other LANS employee not to interview or hire Plaintiff due to his prior performance issues. (*Id.* ¶ 3(gg).)

Plaintiff again stacks his qualifications higher than Mr. Crawford's, who is a Caucasian male and who "does not have experience in quality assurance requirements (QAR)." (Resp. Ex. A, Laul Aff. ¶ 31.)

    f.    Quality Assurance Specialist 2 position (IRC 37678)

On February 27, 2015, LANS posted this position, and Plaintiff submitted an application on February 28, 2015. (Mot. Ex. 9, Tepley Decl. ¶ 3(t).) Mr. Tepley, the hiring manager, received 29 applications for the position. (*Id.*) Mr. Tepley testified that Plaintiff, along with several of the applicants, was not considered for this position because Plaintiff "did not demonstrate any specific experience in inspections and quality assurance—one of the minimum

requirements for the position."[10] (*Id.* ¶ 3(v).) Laura Solano was hired based on her "demonstrated experience in inspections and quality assurance." (*Id.* ¶ 3(w).)

Mr. Tepley testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 3 (y), (z).) Mr. Tepley testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 3(aa).) Nor was Mr. Tepley advised by James Tingey or any other LANS employee not to interview or hire Plaintiff due to his prior performance issues. (*Id.* ¶ 3(x).)

Plaintiff argues that his qualifications are better than Ms. Solano's who has only 10 years' experience in Quality Assurance compared with Plaintiff's 30 years. (Resp. Ex. A, Laul Aff. ¶ 29.) Plaintiff notes that Ms. Solano is a "younger non-Indian." (*Id.*)

6.     Safety Analyst Positions

a.     Critical Safety Analyst 1/2 position (IRC 37674)

On February 19, 2015, LANS posted this position, and Plaintiff submitted an application on February 28, 2015. (Mot. Ex. 10, Wysong Decl. ¶ 3.) Dr. Andrew Wysong, the Nuclear Criticality Safety Division Leader in Nuclear and High Hazard Operations, was the hiring manager. (*Id.*) Dr. Wysong testified that Plaintiff was not interviewed because "he did 'not have hands on experience in running codes'" (*Id.* ¶ 5) (quoting Plaintiff's application). Michael MacQuigg, Trevor Stewart, and Alan Yamanaka were hired "based on either their past

---

[10] In the Response, Plaintiff argues that the Court can imply pretext because the cover letter and resume that are attached to Mr. Tepley's affidavit are not the cover letter and resume that Plaintiff submitted to LANS. (Resp. at 38.) Plaintiff attaches the "correct" cover letter and resume to his Response, which he claims illustrate his quality assurance experience. (Resp. Ex. E.) However, even if Plaintiff's correct documents reflected quality assurance experience, the evidence does not establish a fact issue that he was refused an interview because of his age or national origin or because of his prior complaints of discrimination. There is no evidence that Mr. Tepley's preference for Ms. Solano was a pretext for discrimination. Plaintiff also speculates in his argument that the document mistake is evidence of a business "cover-up." *Webb v. Level 3 Communications, LLC,* 667 F. App'x 725, 733 (10th Cir. 2006) (unpublished) (stating that the plaintiff had presented no evidence of a conspiracy outside of pure speculation).

experience in criticality safety or their demonstrated ability to run safety analysis tools[.]" (*Id.* ¶ 6.) ).) Dr. Wysong testified that at the time of the hiring decision, he did not know about Plaintiff's previous performance issues, discharge, or discrimination claims against LANS. (*Id.* ¶¶ 8, 9.) Dr. Wysong testified he did not consider Plaintiff's age, race, or national origin when making the decision. (*Id.* ¶ 10.) Nor was Dr. Wysong advised by James Tingey or any other LANS employee not to interview or hire Plaintiff. (*Id.* ¶ 7.)

b.      Safety Basis Analyst 1/2 position (IRC 38516)

On April 22, 2015, LANS posted this position, and Plaintiff submitted an application on April 27, 2015. (Mot. Ex. 13, James Tingey Decl. ¶ 3(a).) James Tingey, then the Deputy Division Leader for the Safety Basis Division in Nuclear and High Hazard Operations, was the hiring manager.[11] (*Id.* ¶ 3(a).) Mr. Tingey testified that after a review of the 45 applications for the position, he determined that Plaintiff did not meet the minimum requirements based on "his past job performance at [LANS], in which he failed to demonstrate an ability to successfully perform at the level of a Safety Basis Analyst 1/2." (*Id.* ¶ 3(c).) Francisco Enrique Koerdell-Sanchez, Andrew Montoya, Dr. Alexander Laptev, and Samir El-Darazi were hired for the job posting "based on their demonstrated ability to successfully perform at the level of a Safety Basis

---

[11] In October 2013, two months before Plaintiff's discharge, Mr. Tingey, the Safety Basis Deputy Division Leader, reviewed and approved Mr. Selvage's recommendation that LANS terminate Plaintiff's employment. *Laul*, 2016 WL 9777256, at *11.

Analyst 1/2 or at the same level in a position similar to safety basis analysis." (*Id.* ¶ 3(d).)[12]

Because Mr. Tingey approved the termination of Plaintiff's employment in December 2013, Mr. Tingey was well aware of Plaintiff's past performance issues and Plaintiff's discrimination claims. Mr. Tingey testified he did not consider Plaintiff's discrimination claims, age, race, or national origin in his decision not to interview Plaintiff. (*Id.* ¶ 3(e), (f).)

c.     Safety Basis Analyst 3/4 position (IRC 38573)

On April 25, 2015, LANS posted this position, and Plaintiff submitted an application on April 27, 2015. (*Id.* ¶ 3(h).) Mr. Tingey, the hiring manager, testified that he did not interview Plaintiff because "while employed at LANS, [Plaintiff] … demonstrated an inability to successfully perform at the level of a Safety Basis Analyst 3/4." (*Id.* (i), (j).) Thus, Mr. Tingey

---

[12] Mr. Tingey testified regarding the two positions for which he was the hiring manager:

> Q. After Dr. Laul was terminated, were you ever contacted by any hiring managers at LANL about Dr. Laul?
> A. No.
> Q. Were you aware Dr. Laul was still applying for other positions at LANL after he was terminated?
> A. Yes.
> Q. How did you know that?
> A. Because those applications came to me for assessment.
> Q. And what did you do when the applications came to you?
> A. I had my chief of staff prepare a binder that contained all the resumes for that particular job opening. Then assembled a team and go through the resumes to determine which candidates should be interviewed and—to go further in the process.
> Q. Did you make any recommendations with regard to Dr. Laul's applications whether or not he would be interviewed?
> A. Yes.
> Q. What was your recommendation?
> A. My recommendation was that he would not be interviewed based on the fact that he terminated because his performance in the safety basis area was not satisfactory.
> Q. So would it be fair to say that based on your recommendation that he not be interviewed, he was not given any interviews?
> …
> A. It was the recommendation of the hiring team that we put together.
> …
> Q. Okay. And Mr. Tingey, was it your recommendation in every application you reviewed that Dr. Laul put in that he not be interviewed?
> A. Yes.

(Resp. Ex. B, Tingey Dep. 51:20–53:17.)

determined that Plaintiff did not meet the minimum qualifications for the position. (*Id.*) Sharon Walker was hired for the position "based on her thirty (30) years of successful work in safety basis." (*Id.* ¶ 3(k).) As mentioned, Mr. Tingey was aware of Plaintiff's discrimination claims, but he testified that "this did not affect his consideration of [Plaintiff's] application." (*Id.* ¶ 3(l).) Mr. Tingey also testified that he did not consider Plaintiff's age, race, or national origin. (*Id.* ¶ 3(m).)

Ronald Selvage was the manager of the Safety Basis-Technical Services Group to the Environmental and Waste Management Group at the time Plaintiff was discharged. *Laul*, 2016 WL 9777256, at *5. Mr. Selvage testified about the decisions not to interview Plaintiff for positions in the Safety Basis Group:

> Q. Do you know if Dr. Laul, did he ever apply for any job vacancies in your group?
> A. Yes.
> Q. Did you ever interview him?
> A. No.
> Q. Did you ever consider him for any vacancies that he applied for in your group?
> A. ... as I looked through and look at candidates, I did see Dr. Laul's name on there, and I did not recommend him. I did not look at him for hiring, even though I didn't hire anybody. And I did not recommend him for any positions because he had just been terminated. I didn't stop anybody from—if they had wanted to look or interview, I certainly didn't stop anyone from doing that.

(Resp. Ex. F, Selvage Dep. 72:12–19.)

7.      Operations Positions

a.      Operations Manager 6 position (IRC 38253)

On March 18, 2015, LANS posted this position, and Plaintiff submitted an application on April 9, 2015. (Mot. Ex. 12, Pacheco Decl. ¶ 3.) The hiring manager, Cheryl Cabbil, assigned Barbara Pacheco to review and screen the applications. (*Id.* ¶¶ 2–3.) Ms. Pacheco determined that Plaintiff "did not demonstrate in his application a sufficient level of management experience in the operation of large nuclear and non-nuclear facilities," and elected not to refer Plaintiff for

an interview. (*Id.* ¶ 5.) Brian Watkins, Leslie Sonneberg, and Stuart McKernan were hired for the position "based on their extensive and recent experience in operation of large nuclear and non-nuclear facilities." (*Id.* ¶ 6.)

As a member of the HR department, Ms. Pacheco was aware of Plaintiff's previous performance issues at LANS and Plaintiff's discrimination complaints against LANS. (*Id.* ¶ 8.) In fact, Ms. Pacheco participated in evaluating Plaintiff's performance under the PIP. *Laul*, 2016 WL 9777256, at *8. However, Ms. Pacheco testified that this knowledge did not affect her determination that Plaintiff did not meet the minimum qualifications for this management position. (*Id.*) Ms. Pacheco testified she did not consider Plaintiff's age, race, or national origin when making her decision. (*Id.* ¶ 9.) Ms. Pacheco testified that she was not advised by James Tingey or any other LANS personnel not to interview Plaintiff. (*Id.* ¶ 7.)

Plaintiff maintains that he was more qualified than the successful candidates due to his "10 years of management and 15 years of project management at PNNL, Rocky Flats, and LANL." (Resp. Ex. A, Laul Aff. ¶ 36.) Plaintiff states he was the only East Indian candidate and the persons selected were younger non-Indians. (*Id.*)

> b.    Operations Support Specialist 4 position (IRC 38692)

On April 24, 2015, LANS posted this position, and Plaintiff submitted an application on April 29, 2015. (Mot. Ex. 14, Orr Decl. ¶ 3.) Timothy Orr, then the Safety Basis Manager 6 (Division Leader), was the hiring manager and led the hiring committee. (*Id.* ¶ 2.) Mr. Orr testified that Plaintiff, along with many of the other applicants, was not interviewed because he did not meet the minimum qualifications for the position. (*Id.* ¶ 5.) In addition, the hiring committee determined that Plaintiff "did not have the right skillset for this position because he did not demonstrate the appropriate level of writing skills and his application package did not

provide sufficient specific experience to demonstrate he possessed the required combination of technical and administrative skills necessary for this position." (*Id.* ¶ 5.) Deborah Gonzales and Linda Vosburgh were selected for the position based on their "demonstrated combination of technical, procedure writing, and administrative skills and experience relevant to the requirements of the position." (*Id.* ¶ 6.) Ms. Gonzales had 28 years of experience at LANS, at Rocky Flats Environmental Technology Site, and at Rockwell International; and she exhibited extensive knowledge of Department of Energy orders and had experience writing and editing Technical Safety Requirements (TSR) and Documented Safety Analyses (DSA), all of which were listed as necessary or desired skills in the posting. (*Id.*) Mr. Orr testified that in making the decision, he did not consider Plaintiff's age, race, or national origin and only considered Plaintiff's lack of qualifications for the position. (*Id.* ¶ 9.)

Plaintiff testified:

Q. –what did the hiring officer—was Mr. Orr—what did he do with that information [age, race and ethnicity]? How did he use it?
A. Well, the fact is he didn't give me a job interview. That means he ruled me out. And now he says that …
Q. He ruled you out.
A. He ruled me out.
Q. Who else did he rule out—
A. Well, he—
Q. –based on age or ethnicity?
A. Other peoples, too, but they don't—all of them don't have Ph.Ds.
Q. Okay. (Simultaneous discussion.)
Q. So you think he—he—he basically said, "Okay, I don't want the East Indians."
A. That may be his thinking, but he's not telling me.
Q. You don't know right?
A. Yeah. I don't know, but this is my belief.

(Mot. Ex. 2, Laul Dep. 700:15–701:10.) Plaintiff testified in minute detail explaining why his qualifications and experience were superior to the successful candidates' qualifications and experience. (Resp. Ex. A, Laul Aff. ¶¶ 44–46.) For example, Plaintiff testified that he had

"experience in various areas such as writing and/or reviewing DSAs, BIOs, AB or SB, USQDs, SSCs and TSRs for nuclear facilities; and HC, FSA, FSP for non-nuclear facilities[,]" and Plaintiff cited his "10 years of management and 15 years of project management experience." (*Id.* ¶ 44.) Plaintiff testified that he was discriminated against in this decision because he was the only East Indian applicant and he is substantially older than the successful candidates. (*Id.* ¶ 46.)

8.    Radiation Protection Manager 4 position (IRC 38434)

On April 6, 2015, LANS posted this position, and Plaintiff submitted an application on May 4, 2015. (Mot. Ex. 15, Jones Decl. ¶ 3.) Scotty Jones, Radiation Protection Division Leader in the LANS Environment, Safety and Health Directorate, was the hiring manager and the leader of the hiring committee. (*Id.* ¶¶ 2–3.)  Mr. Jones testified that he did not interview Plaintiff due to Plaintiff's "lack of sufficient management experience in radiation protection or any other related field." (*Id.* ¶ 5.) Stephen Costigan, a 54-year-old Caucasian, was hired, "based on his demonstrated management experience in radiation protection, his demonstrated problem-solving abilities, and his relevant experience as a Group Leader and acting Division Leader in the Radiation Protection Division." (*Id.* ¶ 6.)

Mr. Jones testified that when he made the hiring decision, he was not aware of Plaintiff's previous performance issues, the termination of his employment for poor performance, or Plaintiff's previous discrimination claims against LANS. (*Id.* ¶ 8.) In making his decision, Mr. Jones did not consider Plaintiff's age, race, or national origin. (*Id.* ¶ 10.) During the process of reviewing Plaintiff's application neither James Tingey nor any other LANS employee advised Mr. Jones not to interview or hire Plaintiff due to his performance issues. (*Id.* ¶ 7.)

Plaintiff testified that he is more qualified than Mr. Costigan whose application "lacks information in relation to his knowledge in 10 CFR 835; 'Occupational Radiation Protection

Program' and its applications; ESH&Q, DOE O 435.1 'Radioactive Waste Management', and 10 CFR 851 'Worker Safety and Health Program'." (Resp. Ex. A, Laul Aff. ¶ 48.) Mr. Costigan is a younger Caucasian. (*Id.* ¶ 49.)

### C. Plaintiff's Charge and Complaint

On July 22, 2015, Plaintiff filed charges of discrimination and retaliation with the New Mexico Department of Labor, Human Rights Division. (*Id.* ¶ 9.) On September 12, 2016, Plaintiff filed this Complaint. In Count I, Plaintiff alleges that LANS failed to rehire him because of his age in violation of the ADEA and the NMHRA. (Compl. ¶¶ 24–26.) In Count II, Plaintiff asserts a claim that LANS refused to rehire him based on his national origin in violation of the NMHRA and Title VII. (*Id.* ¶¶ 27–29.) In Count III, Plaintiff contends that LANS declined to rehire him in retaliation for his previous complaints about unlawful discrimination. (*Id.* ¶¶ 30–33.)

## III. DISCUSSION

### A. Collateral Estoppel

In its Motion, LANS argues that under the doctrine of collateral estoppel, any issues that were decided in the prior action, *Laul I,* cannot be relitigated in this action. *Augustine v. Adams*, 88 F. Supp. 2d 1166, 1177 (D. Kan. 2000) (summary judgement is a final judgment on the merits for purposes of collateral estoppel). "[C]ollateral estoppel ... prevents a party from re-litigating 'ultimate facts or issues actually and necessarily decided in a prior suit.'" *Cordova v. New Mexico Taxation & Revenue Dep't*, CIV 08-0681 JB/ACT, 2011 WL 7164459, at *27 (D.N.M. Dec. 28, 2011) (unpublished) (quoting *Ullrich v. Blanchard,* 2007-NMCA-145, ¶ 19, 171 P.3d 774,142 N.M. 835 (citations omitted)). For collateral estoppel to apply, four elements must be met: "(1) the parties in the current action were the same or in privity with the parties in the prior

action, (2) the subject matter of the two actions is different, (3) the ultimate fact or issue was actually litigated, and (4) the issue was necessarily determined." *Cordova*, 2011 WL 7164459, at * 11 (quoting *Ullrich supra*). *See also Howard v. Las Animas County Sheriff's Office*, 09-CV-00640-PAB-KLM, 2010 WL 1235668, at *6 (D. Colo. Feb. 23, 2010), *report and recommendation adopted*, 09-CV-00640-PAB-KLM, 2010 WL 1235673 (D. Colo. Mar. 22, 2010) (unpublished) (holding that plaintiff's was precluded from relitigating the termination of his employment "by collateral estoppel because his discrimination and retaliation claims have already been decided adversely to him on the merits in this Court.").

In *Laul I*, Plaintiff asserted that LANS rejected several different job applications other than those at issue here because of discrimination or in retaliation for Plaintiff's complaints of discrimination in late 2013. On the claim that Plaintiff was not hired due to his age, national origin or race, the Court found that Plaintiff failed to rebut LANS' evidence that Plaintiff was not as qualified as the successful applicants. 2016 WL 9777256, at * 25. The Court further found that Plaintiff failed to establish that the proffered reason for his rejection was a pretext for unlawful discrimination. *Id.* at * 26.

On Plaintiff's retaliatory failure to hire claim, this Court found that Plaintiff had established a prima facie case of retaliation because his complaints of discrimination were very close in time to the dates he submitted his applications for positions at LANS. *Id.* at * 27. However, the Court determined that Plaintiff failed to establish that the reason he was not hired, lack of qualifications and experience, was a pretext for retaliation. "Plaintiff presented no rebuttal to the testimony of each hiring manager that Plaintiff did not meet the minimum qualifications for a position or that Plaintiff was not the best qualified for a position." *Id.* This Court also rejected Plaintiff's argument that Mr. Tingey's and Mr. Selvage's asserted reason for

not recommending Plaintiff, the recent discharge for poor performance, was a pretext for retaliation. *Id.* On appeal the Tenth Circuit upheld this Court's finding: "[B]oth Selvage and Tingey testified that their decisions were based solely on Laul's termination for poor performance. Laul identifies no evidence that Selvage and Tingey did not honestly believe the legitimate nondiscriminatory reason they gave for their decisions or that they did not act in good faith on their beliefs." 714 F. App'x at 840.

In its Motion, LANS argues that this Court's and the Tenth Circuit's holdings on that issue should foreclose Plaintiff from arguing "that Mr. Tingey or any other hiring manager's determination not to interview or hire Dr. Laul based on prior poor performance is not a legitimate, non-discriminatory and non-retaliatory reason for such action." (Mot. at 27.) In response, Plaintiff argues he should be allowed to argue that the hiring managers who refused to hire him did not honestly believe in their proffered reasons or did not act in good faith. In short, Plaintiff wants to argue that if a hiring manager proffered Plaintiff's discharge as a reason for his rejection, Plaintiff should be allowed to attack it as a pretext for discrimination or retaliation. Plaintiff reasons that collateral estoppel should not bar him from this argument because the positions at issue in this case are different from the positions for which he applied in *Laul I*.

In *Laul I* the Court decided that Messrs. Selvage and Tingey had a legitimate, nondiscriminatory, non-retaliatory reason for not recommending that Plaintiff be hired. The Court also decided that Plaintiff presented no evidence that Messrs. Selvage and Tingey did not act honestly or in good faith. The evidence in this case shows that the only positions that Mr. Tingey and Mr. Selvage were involved in were the two Safety Basis Analyst positions (IRC 38516 and IRC 38573) submitted in April 2015. Because the issue is identical and the parties are the same, the Court will preclude Plaintiff from arguing that Messrs. Tingey and Selvage were

not acting honestly or in good faith in proffering this legitimate reason for rejecting Plaintiff. However, there is no evidence that the other hiring managers, except Ms. Pacheco, were aware of Plaintiff's discharge. And those hiring managers and Ms. Pacheco have not proffered the discharge as the reason Plaintiff was not hired. Hence, the Court will only bar Plaintiff from arguing that Messrs. Selvage and Tingey were not honest or were not acting in good faith in proffering Plaintiff's discharge as their reason for not hiring Plaintiff for the two Safety Basis postings. To show pretext as to those positions, Plaintiff must present additional evidence.

B.      Counts I and II: Discriminatory Failure to Hire[13]

Plaintiff has not come forward with any direct evidence of LANS' discriminatory intent; therefore, the Court will analyze Plaintiff's discriminatory failure to hire claims using the *McDonnell Douglas* burden-shifting analysis. *McDonnell Douglas Corp.,* 411 U.S. at 802–04. To establish a prima facie case of discriminatory failure to hire, "a plaintiff must show that (1) he applied for an available position; (2) he was qualified for the position; and (3) he was rejected under circumstances which give rise to an inference of unlawful discrimination." *Anaeme v. Diagnostek, Inc.* 164 F.3d 1275, 1278 (10th Cir. 1999). If Plaintiff establishes a prima facie case, the burden shifts to LANS to articulate some legitimate, nondiscriminatory reason for its action. *McDonnell Douglas*, 411 U.S. at 802. If LANS carries that burden, Plaintiff can avoid summary judgment "by presenting evidence that the employer's reason is pretextual, i.e., unworthy of belief or by otherwise introducing evidence of a discriminatory motive." *Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir. 2002) (citation omitted).

---

[13] Because Plaintiff uses the same evidence to support both age and national origin discrimination, the Court will address the failure to hire claims in Counts I and II together. Also, since claims under the NMHRA are analyzed similarly to their federal counterparts, the Court will address Counts I and II under the federal standards. *Clayton v. Vanguard Car Rental U.S.A., Inc.*, 761 F. Supp. 2d 1210, 1249–50 (D.N.M. 2010) (noting that the Supreme Court of New Mexico applies the framework established in *McDonnell Douglas* "[w]hen considering a violation of the NMHRA.") (quoting *Juneau v. Intel Corp.*, 2006-NMSC-002, ¶ 9, 139 N.M. 12, 127 P.3d 548 (2005)).

Pretext can be shown "by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir. 1997) (quotation omitted). In deciding if a plaintiff has made a sufficient showing of pretext, the court "must consider the evidence as a whole." *Danville,* 292 F.3d at 1250. Mere allegations are insufficient, *Morgan,* 108 F.3d at 1324, and "mere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment," *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir. 1988).

At the summary judgment stage, the plaintiff's own conclusory opinions about his qualifications and about the employer's motives do not give rise to a material factual dispute. *Bullington v. United Air Lines,* 186 F.3d 1301, 1318 (10th Cir. 1999). The pertinent inquiry at this stage does not focus on whether the employer's "proffered reasons were wise, fair or correct," but looks at whether the employer "honestly believed those reasons and acted in good faith on that belief." *Id.* (citation omitted). Importantly, in deciding pretext, the courts are not to act as "super-personnel departments" that second-guess employers' business judgments. *Tyler v. RE/MAX Mountain States, Inc.,* 232 F.3d 808, 813–14 (10th Cir. 2000). "However, '[e]vidence indicating that an employer misjudged an employee's performance or qualifications is, of course, relevant to the question whether its stated reason is a pretext masking prohibited discrimination.'" *Id.* at 814 (quoting *Fischbach v. District of Columbia Dept. of Corrections,* 86 F.3d 1180, 1183 (D.C. Cir. 1996)).

1.	Plaintiff's Prima Facie Case

The Court finds that Plaintiff has presented sufficient evidence to meet the first element of a prima facie case of age and national origin discrimination. Plaintiff applied for several positions at LANS.

As to the second element, LANS argues that it presented the testimony of hiring managers showing that Plaintiff did not meet the minimum qualifications for several of the 19 positions at issue.[14] Therefore, as to those positions, LANS argues Plaintiff fails to meet the second element of his prima facie burden. The 12 positions are: (1) Environmental Professional 3 (IRC 35849); (2) Environmental Professional 3 (IRC 35763); (3) Scientist 2/3 (IRC 37277); (4) Quality Assurance Engineer 4 (IRC 37672); (5) Quality Assurance Engineer 4 (IRC 37732); (6) Criticality Safety Analyst 1/2 (IRC 37674); (7) Quality Assurance Specialist 2 (IRC 37678); (8) Quality Assurance Engineer 3/4 (IRC 37952); (9) Environmental Manager 3 (IRC 37809); (10) Operations Manager 6 (IRC 38252); (11) Safety Basis Analyst 3/4 (IRC 38573); and (12) Operations Support Specialist 4 (IRC 38692).

Plaintiff counters that he presented evidence sufficient to create a fact issue that he was qualified for all 19 of the positions. That evidence consists of Plaintiff's self-serving affidavit testimony. Plaintiff's subjective belief that he possessed the qualifications for these positions is insufficient to create a fact issue capable of overcoming summary judgment. *Toney v. Cuomo*, 92 F.Supp.2d 1186, 1192 (D. Kan. 2000) (stating that plaintiff's own opinions that he was more qualified than the applicant chosen for a promotion did not give rise to a material factual dispute that the proffered reasons for not choosing plaintiff were pretexts for discrimination). Although

---

[14] The Motion contains a chart illustrating that for 12 of the 19 positions, Plaintiff was rejected by the hiring manager because he did not have the minimum qualifications for the position. Actually the chart contains 13 positions, but regarding the position of Environmental Professional 3 (IRC 37521), the hiring manager determined that Plaintiff was not the best qualified candidate.

the Court believes that Plaintiff has failed to meet the second element regarding the 12 positions, the Court will assume that the element has been met and move to the third element and discuss Plaintiff's evidence as it relates to all 19 positions.

Plaintiff has failed to meet the third element of his prima facie case of age or national origin discrimination. Plaintiff has presented no evidence, other than his subjective belief, from which the Court can reasonably infer that Plaintiff was not interviewed or hired because of his age or national origin. In addition, each hiring manager testified that age and national origin did not enter into their decisions not to interview Plaintiff for the positions. For a complete analysis, however, the Court will discuss the evidence of pretext.

2.      LANS' Legitimate Reasons for Not Hiring Plaintiff

For all of the positions except the positions over which Tingey was hiring manager, the decision not to hire Plaintiff was because Plaintiff lacked the minimum qualifications for the position or Plaintiff was not the best qualified applicant. With regard to Mr. Tingey's evaluation of Plaintiff for two positions, Safety Basis Analyst 1/2 (IRC 38516) and Safety Basis Analyst 3/4 (IRC 38573), Mr. Tingey determined that Plaintiff was not qualified based on "his past job performance" in which Plaintiff "failed to demonstrate an ability to successfully perform at the level" of either Safety Basis Analyst 1/2 or 3/4. As discussed above, Plaintiff's past discharge for poor performance is a legitimate reason for not hiring him. Therefore, LANS has established legitimate nondiscriminatory reasons for not hiring Plaintiff for all 19 positions: (1) Plaintiff was not minimally qualified for some positions; (2) Plaintiff was not the best qualified candidate for some positions; and (3) Plaintiff was not qualified based on his past job performance for the positions handled by Mr. Tingey.

### 3.  Pretext

Since LANS has proffered a valid reason for not hiring Plaintiff, Plaintiff must "present evidence that that proffered reason he was not hired was pretextual, i.e. unworthy of belief." *Beaird v. Seagate Tech., Inc.*, 145 F.3d 1159, 1165 (10th Cir.1998) (quotation marks omitted). It is not enough that Plaintiff testified that he was more qualified than each successful candidate and that the candidates were younger and non-Indian. *See Anaeme*, 164 F.3d at 1284 ("The mere failure to hire Plaintiff as compared to other qualified non-African-American candidates may not be sufficient to establish an inference of race discrimination."); *Angione v. Sikorsky Aircraft Corp.*, 199 F.Supp.3d 628, 639 (D. Conn. 2016) ("Standing alone, the fact that [defendant] may have hired someone who was younger than [plaintiff] does not raise an inference of discrimination."). LANS is entitled to select candidates based on its notion of the qualifications required for a job as long as the qualifications are not discriminatory. And a claimant who argues that he is more qualified than the chosen candidate must show there was a great disparity in qualifications in order to create a fact issue that this reason is a pretext for discrimination. *See Johnson v. Weld Cty.*, 594 F.3d 1202, 1211 (10th Cir. 2010) ("[T]o suggest that an employer's claim that it hired someone else because of superior qualifications is pretext for discrimination rather than an honestly (even if mistakenly) held belief, a plaintiff must come forward with facts showing an overwhelming disparity in qualifications."). Plaintiff's own testimony that he was not chosen because he is 77 years old or East Indian, is insufficient for this Court to find that LANS' reasons for not hiring Plaintiff were unworthy of belief. (*See* Mot. Ex. 2, Laul Dep. 478:7–11; 510:4–16; 699:11–701:10.) And Plaintiff's argument that he was more qualified than the applicants who were hired does not support pretext because Plaintiff has not shown that there

was a great discrepancy between Plaintiff's qualifications and the successful candidates' qualifications.

Plaintiff argues that he presented evidence of pretext through Ms. Pacheco's testimony that he "was never going to be hired" at LANS after he was discharged. However, this argument mischaracterizes Ms. Pacheco's testimony. Ms. Pacheco testified:

> Q. Have you ever been involved in rehiring an employee who had been fired for performance issues?
> A. I'm going to say, yes. We had a reduction in force. And several of those folks were on a—based on performance. And that was in 1995. And we did do some hiring of those employees—rehiring.
> Q. Associated with a RIF?
> A. Yes.
> Q. And my understanding is people that were—maybe the low performers are the ones that usually were on the list to go first, is that correct, on a RIF?
> A. I'm not going to say which ones went where; but, yeah, they were performance issues usually.
> Q. Okay. So you have had issues where—or situations where an employee who may be on a RIF would be rehired later?
> A. Correct.
> Q. Have you ever had an employee in a situation like Dr. Laul where they were fired for performance issues, who were rehired at the Lab, that you are aware of?
> A. I have not, personally.

(Resp. Ex. D, Pacheco Dep. 44:19–45:18.) Instead of saying that Plaintiff was never going to be rehired, Ms. Pacheco simply testified that she personally had never seen a person who was fired for poor performance get rehired. Thus, Ms. Pacheco's testimony cannot support pretext.

As the Court found in *Laul I*, LANS' decision to discharge Plaintiff was not based on his age or national origin; therefore, the fact that Plaintiff was discharged for poor performance cannot be used as evidence of pretext for rejecting Plaintiff in this case. *Sengillo v. Valeo Elec. Systems, Inc.*, 328 F. App'x 39, 41 (2d Cir. 2009) (unpublished) (finding that employer's decision not to rehire plaintiff who was terminated for poor performance was a legitimate, non-discriminatory reason for electing not to rehire the plaintiff); *Mullen v. Waterbury Board of*

*Educ.*, No. 3:15-CV-00023 (VLB), 2017 WL 6060875, at *4 (D. Conn. Dec. 7, 2017) (unpublished) (finding that poor performance at a previous job was a legitimate, nondiscriminatory reason for deciding not to hire an applicant); *Wallace v. Beech Aircraft Corp.*, 87 F. Supp. 2d 1138, 1149 (D. Kan. 2000) (finding that reasons for previous termination of employment, such as poor performance of job duties, were not pretext for discrimination in failure to rehire plaintiff after plaintiff's employment was terminated). In sum, no rational factfinder could base a finding of pretext on the evidence presented in this summary judgment record. *Wallace v. Beech Aircraft Corp.*, 87 F. Supp. 2d at 1149.

The Court will grant summary judgment in favor of LANS on Plaintiff's Count I claim that he was rejected for the 19 positions based on age discrimination and on Plaintiff's Count II claim that he was rejected for the 19 positions based on national origin discrimination.

C.      Count III: Retaliatory Failure to Hire

To establish a prima facie case of retaliation under Title VII, a plaintiff must show that "(1) she engaged in protected opposition to discrimination; (2) she suffered an adverse action that a reasonable employee would have found material; and (3) a causal nexus exists between her opposition and the employer's adverse action." *Chung v. El Paso Cty./Colorado Springs Sch. Dist. #11*, 115 F. Supp. 3d 1242, 1260 (D. Colo. 2015), *aff'd sub nom. Chung v. El Paso Sch. Dist. #11*, 659 F. App'x 953 (10th Cir. 2016) (citations omitted).

Plaintiff has met the first two elements of his prima facie case. As outlined in *Laul I*, Plaintiff complained of discrimination through the grievances in 2011 and 2012 and an email sent to Mr. Selvage and Ms. Pacheco on November 13, 2013. *See* 2016 WL 9777256, at * 13–14. On January 5, 2014, Plaintiff sent a letter to LANS' Executive Director, Richard Marquez, describing Mr. Selvage's unwillingness to take certain actions as "harassment and discriminatory

practice." Plaintiff filed a charge of discrimination with the New Mexico Department of Labor, Human Rights Division on September 11, 2014 and he filed an amended charge on October 30, 2014. All of these activities are considered protected activities because Plaintiff opposed unlawful discrimination. *See Hinds v. Sprint/United Mgmt. Co.*, 523 F.3d 1187, 1202–03 (10th Cir. 2008) (finding certain emails did not constitute protected activity because they were general complaints about company management).

Plaintiff argues that his two encounters with Ms. McMillan constitute protected activity because he complained about his discriminatory discharge from employment at LANS. However, Ms. McMillan testified that Plaintiff merely complained that he had been "unjustly terminated from his position." (Mot. Ex. 17, McMillan Decl. ¶ 6.) Plaintiff himself testified that he only complained to Ms. McMillan about the process related to his discharge. (Resp. Ex. I, Laul Dep. 120: 22–121:12.) Therefore, Plaintiff's complaints to Ms. McMillan are not protected activity. *Hinds*, 523 F.3d at 1202–03.

To establish the third element Plaintiff must also show that the persons responsible for hiring were aware of his protected activities. However, most of the hiring managers testified that they were unaware of Plaintiff's complaints of discrimination. *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1235 (10th Cir.2000) (affirming dismissal of retaliation claim on summary judgment where plaintiff presented no evidence that decision maker knew of plaintiff's protected activity at time decision was made). Plaintiff counters that there is a dispute as to whether the hiring managers had knowledge of his protected activity because "Defendant's HR, who was aware of Plaintiff's reports of discrimination, was in charge of organizing the files for the hiring managers when asked." (Resp. at 33.) Plaintiff is merely speculating that all of the hiring managers, in contravention of their sworn testimony, had knowledge of his complaints

because they could have asked for his personnel file. Hence, the evidence shows that all of the hiring managers except Ms. Pacheco and Mr. Tingey were unaware of Plaintiff's complaints of discrimination.

Ms. Pacheco and Mr. Tingey handled the hiring for three of the 19 positions. They testified that they rejected Plaintiff based on his lack of qualifications or based on his previous discharge for poor performance and not because he complained about discrimination. (Mot. Ex. 12, Pacheco Decl. ¶ 8; Ex. 13, Tingey Decl. ¶ 3(l)).) Plaintiff argues that he has shown causation by noting the close temporal proximity between the date of his last protected activity and the dates he was rejected by Mr. Tingey and Ms. Pacheco. The decisions to hire for the positions managed by Ms. Pacheco and Mr. Tingey happened in April 2015, which is 5 to 6 months after Plaintiff's last protected activity on October 30, 2014. Under Tenth Circuit case law, a five to six month gap between a protected activity and an adverse employment action is too long to constitute "close temporal proximity" and thereby raise the inference of retaliation. *See, e.g., Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1208 (10th Cir. 2007) ("Four months is too large a time gap to establish a causal connection."); *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215 1228 (10th Cir. 2006) *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (stating that seven month period between protected activity and adverse employment action was not close enough in proximity to establish causation element of prima facie retaliation claim); *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir. 1999) ("[A] three-month period, standing alone, is insufficient to establish causation."). Plaintiff further argues that the investigation related to his October 30, 2014 amended charge culminated several months later, narrowing the gap in time. However, even if the Court takes that into account and finds a prima facie case for the three positions managed by Mr. Tingey and Ms.

Pacheco, Plaintiff has still failed to rebut the legitimate reasons given for rejecting his applications.

Simply put, Plaintiff has not created a disputed issue of material fact as to whether these proffered reasons are "unworthy of belief." Mr. Tingey testified that he did not consider Plaintiff for the two Safety Basis Analyst positions based on Plaintiff's "past job performance at LANL." (Mot. Ex. 13, Tingey Decl. ¶ 3(c); (j).) Ms. Pacheco testified that Plaintiff lacked sufficient management experience in the operation of large nuclear and non-nuclear facilities. (Mot. Ex. 12, Pacheco Decl. ¶ 5.) Plaintiff presents no evidence showing that these reasons are unworthy of credence. *See Sengillo,* 328 F. App'x at 41 (unpublished) (upholding dismissal of retaliatory failure to rehire claim based on evidence that plaintiff was not rehired because he was discharged from a position in another department for poor performance).

D.      Retaliatory Issuance of the BOLO

Plaintiff also contends that his complaint to Ms. McMillan about his unfair treatment at LANS constituted protected activity. The Court has concluded that Plaintiff did not complain specifically about discrimination. However, even if Plaintiff did complain about discrimination to Ms. McMillan, the evidence clearly shows that the BOLO was issued because of the inappropriate and threatening nature of Plaintiff's conduct in his encounters with Ms. McMillan. (Mot. Ex. 19, Marquez Dep. 22:20–23:19.) And, there is no evidence that members of the security department, who issued the BOLO, knew about Plaintiff's prior complaints of discrimination. Therefore, Plaintiff has failed to set forth evidence to support a finding that the BOLO was issued in retaliation for his complaints of discrimination.

IT IS ORDERED that DEFENDANT LOS ALAMOS NATIONAL SECURITY, LLC'S

MOTION AND MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY

JUDGMENT (Doc. No. 58) is granted.

_____
SENIOR UNITED STATES DISTRICT JUDGE